Filed 5/14/15  In re Nathaniel C. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re NATHANIEL C., A Person Coming Under the Juvenile Court Law. | B255699 |
| | (Los Angeles County Super. Ct. No. CK97086) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| Nancy G., | |
| Defendant and Appellant. | |

APPEAL from order of the Superior Court of Los Angeles County, Honorable Rudolph A. Diaz, Judge.  Appeal Dismissed.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Nathaniel C., born June 2007, is the biological child of Nancy G. (mother) and Luis D. (father). The juvenile court declared Nathaniel a dependent in December 2012, after mother pled no contest to allegations that she physically abused Nathaniel and failed to protect him from physical abuse by mother's male companion. The court ordered Nathaniel placed in father's custody, under the supervision of the Los Angeles Department of Children and Family Services (the Department). More than a year after Nathaniel's detention, the court completed the mandatory status review hearing under Welfare and Institutions Code section 364.[1] Despite undisputed evidence establishing that Nathaniel had been safely maintained in father's custody for the term of the supervision, the court declined to terminate its jurisdiction, citing concerns that father unreasonably interfered with mother's visitation with the child. The court ordered mother's monitored visits to continue, until such time as the court was "satisfied" father would allow regular visitation if it terminated jurisdiction.

Mother appeals from the section 364 order to the extent the court refused to grant her unmonitored visitation with Nathaniel. Notwithstanding the court's concerns over visitation, we conclude section 364 required the court to close the case because there was no evidence that conditions still existed which would have justified the initial assumption of jurisdiction under section 300. Because our conclusion means the court had no jurisdiction to order monitored or unmonitored visitation when it entered the order mother challenges on appeal, we will dismiss mother's appeal as moot.

---

[1]     Subsequent statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

## FACTS AND PROCEDURAL BACKGROUND

Father and mother were never married and separated shortly after mother learned she was pregnant with Nathaniel. In 2010, mother disappeared with Nathaniel, prompting father to hire a private investigator to locate them. In October 2011, father obtained a family court judgment granting him joint legal and physical custody of Nathaniel.

Nathaniel resided with mother during the week and with father on the weekend. Mother shared a home with her male companion, Jose R., and their two children, two-year-old Nevan R. and five-month-old Nayson R. Father lived with his girlfriend and her 11-year-old son and 14-year-old daughter. Father also had weekend visits with his daughter from a previous relationship.

On December 5, 2012, mother brought Nathaniel to school with a red mark in the shape of a handprint on the right side of his face. Mother admitted she hit Nathaniel because she was angry with him and she " 'can't control it.' " Mother also admitted to using a sandal to corporally discipline Nathaniel in the past. Nathaniel reported that mother slapped his face with an open hand and hit him with a sandal on his body. He also reported that Jose R. hit him with a fist and sandal, and had pelted him with eggs. Nathaniel said he was scared to return to mother's and Jose's home. A doctor who examined Nathaniel observed numerous marks on his body "consistent with physical abuse."

Father told the Department's investigator that he had noticed Nathaniel's bruises, but when he asked Nathaniel about the marks, Nathaniel would not say how he got them. Father also noticed that Nathaniel had lost weight and he had growing concerns about the child's safety at mother's home. Father told the investigator that he recently enrolled Nathaniel under his health, vision and dental insurance plans, and that he hoped to obtain full custody of Nathaniel to give him a stable home.

On December 24, 2012, the Department filed a dependency petition on behalf of Nathaniel. The petition alleged that mother physically abused Nathaniel by striking him in the face with her hand and about the body with a sandal, leaving bruises and marks on the child's body, and that mother's male companion, Jose R., also physically abused Nathaniel, while mother failed to protect her son. The juvenile court found prima facie evidence of risk supporting the detention from mother. The court ordered Nathaniel released to father's custody, with monitored visits for mother and no contact with Jose. The court also authorized the Department to remove Nathaniel's younger half siblings, Nevan and Nayson, from mother's and Jose's custody.

On January 28, 2013, the juvenile court held a combined jurisdiction and disposition hearing. Mother and Jose pled no contest to the physical abuse and failure to protect allegations. The court sustained the allegations, declared Nathaniel a dependent, and ordered him removed from mother's custody and placed with father under the Department's supervision. The court also declared Nevan and Nayson dependents and ordered them removed from mother's and Jose's custody. The court granted mother monitored visits and ordered her to participate in parenting classes and individual counseling to address issues contributing to her excessive use of physical discipline.

The Department's July 25, 2013 status review report observed that Nathaniel was healthy and continued to "thrive in the home of father." The Department reported Nathaniel was "doing well in school and appears very comfortable and happy in the home with his father."

During the review period, mother had weekly visits with Nathaniel, which were monitored by the paternal grandmother. However, the paternal grandmother spoke only Spanish, yet mother insisted on speaking English to Nathaniel. Father requested that the Department assign a different monitor, but due to conflicts with mother's work schedule and Nathaniel's school schedule, visitation with a new monitor had not been arranged.

The foster caretaker for Nathaniel's half siblings also reported problems with visitation. Mother and Jose initially visited the children separately, but once they started visiting together, the caretaker indicated the parents constantly argued in front of the children. On June 12, 2013, the court ordered mother and Jose not to visit the half siblings together. Mother stated she understood the order.

On July 25, 2013, the court held the initial section 364 review hearing. Father requested to set the matter for a contest to terminate jurisdiction in view of the fact that Nathaniel had been safe in his home for six months. The court set the matter for a contested hearing, which commenced on October 3, 2013 and was continued to December 6, 2013.

From July to September 2013, Jose had unmonitored visits with Nevan and Nayson; mother's visits remained monitored. However, on September 22, 2013, the half siblings' social worker observed, without mother's and Jose's knowledge, that mother and Jose visited the children together, in violation of the court's orders, and transported the children in a car, though neither had a valid driver's license. Based on this information, the Department filed a section 388 petition to return Jose's visitation to monitored status. The court granted the petition.

In its December 6, 2013 status report, the Department recommended that the court terminate jurisdiction as to Nathaniel and enter an exit order granting father full legal and physical custody, with monitored visits for mother. The Department reported that Nathaniel was doing well in school and he appeared happy to be in father's home. Nathaniel also stated he wanted to remain with father and have visits with mother. The Department did not observe any safety concerns.

At the December 6, 2013 hearing, father testified that mother had only visited Nathaniel once in three weeks. Father claimed he contacted the social worker several times to arrange more visits, but those had not occurred. Mother's counsel asked for a continuance to call the social worker to testify concerning father's representations about mother's visitation. The court ordered a continuance to January 16, 2014 so mother could examine the social worker.

5

On January 13, 2014, three days before the scheduled section 364 hearing, the Department received an anonymous Child Abuse Hotline referral claiming father was using drugs. Father denied the allegation and told the investigating social worker he believed "it was common sense that the person who called in the referral was mother . . . 'because she wants to keep the case open.' " In view of the referral, the Department changed its standing recommendation to terminate jurisdiction and asked that the matter be continued for 30 days to investigate the allegation.

At the January 16, 2014 hearing, mother's counsel recalled father to examine him concerning the drug allegation.[2] Father denied using marijuana or other drugs and testified that the Department had not asked him to drug test. Mother's counsel pressed him about a handful of purported Facebook posts in which father was pictured in promotional materials for a rap album, and asked father if his hand gesture in one of the pictures was "a gang sign" representing "the west coast/east coast rivalry in rap music." Father responded that he did not have a Facebook account and was unaware of the posts; though he had wanted to be a "rap star" when he was 17 years old, he had since given that up to focus on "being a father"; and he did not know anything about gang signs because he was not in a gang.

Father also testified that mother had only attempted to visit Nathaniel once since the last court hearing. Because mother hid Nathaniel from him in 2010, father said he was afraid she and Jose would abscond to Mexico with the boy if she were allowed to have unmonitored visits. Father believed mother should be in Nathaniel's life, but did not want her to have unmonitored visits with the child.

---

[2] Despite requesting a continuance to examine the social worker concerning mother's visitation, mother's counsel did not call the social worker to testify at the January 16, 2014 hearing.

6

Father's and Nathaniel's counsel both argued there was no evidence of drug use by father and it was "fairly obvious" that mother had made the referral to keep the case open, since it had been trailing for more than three months with a pending recommendation to terminate. Mother's counsel acknowledged that she had told the Department social worker multiple times that father used drugs, but mother did not think she made the recent referral. Due to time constraints, the juvenile court concluded the hearing for the day and continued it to the next week. Mother's counsel requested an order requiring father to submit to drug testing. The court denied the request.

At the January 23, 2014 hearing, the Department renewed its recommendation to hold the case open for a month to investigate the drug referral. Mother submitted on the recommendation. Father's and Nathaniel's counsel joined in requesting the court terminate jurisdiction and enter a family law exit order granting father sole legal and physical custody, with monitored visits for mother. Nathaniel's counsel argued there was no evidence to support the drug use allegation, and father had provided Nathaniel exemplary care since the case began. Father's counsel pointed out that jurisdiction must be terminated under section 364 unless the court finds conditions still exist that would justify an initial assumption of jurisdiction. Because there was no evidence of risk to Nathaniel, and issues concerning mother's visitation should be addressed by the family law court, father's counsel argued the court must terminate jurisdiction.

The juvenile court denied the request to terminate jurisdiction, explaining its reasons, in relevant part, as follows:

> "I do think it would be inappropriate to terminate this case at
> this time. I don't think it's in the child's best interest. . . .
> [¶] . . . [¶] I think -- the impression you get is that father is
> going to continue to make it difficult, if not impossible, for
> mother to visit with the child. . . . And until the court can see
> that there is a regular visitation occurring, the court will
> continue to consider whether or not to keep this case open.
> And, in fact, . . . it is a family law position that the custodial

7

parent is to facilitate visitations, as well, with a noncustodial parent, and I think that's not happening.  [¶]  I know that this case would drag on and on if they were allowed to be terminated here and allow the parents to go into the family law court.  It would be months, if not years, before this matter is resolved. . . .  I think Nathaniel's entitled to some closure, as well, and I want to see an effort on father's part to ensure that mother is visiting with Nathaniel.  At this point, he's not doing that, all right?  So I'm going to deny the request to terminate this matter . . . ."

The juvenile court ordered that mother's visits with Nathaniel were to remain monitored, and denied mother's counsel's request for conjoint therapy between mother and Nathaniel.  In doing so, the court reemphasized the ground upon which it had determined to retain jurisdiction:  "All we're trying to do is remedy the visit situation, and if that continues to be a problem, then I will reconsider your application [for conjoint counseling].  But the *only reason I'm keeping this open is because he's not visiting with his mother on a regular basis*, and when I'm satisfied that's going to happen, then we can consider terminating this case."  (Italics added.)

Mother filed a notice of appeal from the order denying her unmonitored visits with Nathaniel.  Father and Nathaniel each filed separate appeals from the order denying their requests to terminate jurisdiction.

On August 4, 2014, while these appeals were pending, the juvenile court entered an order terminating jurisdiction and releasing Nathaniel to father.[3]  The order states the court also signed a family law order for joint legal custody and sole physical custody to father.  Father and Nathaniel thereafter abandoned their appeals.  (Cal. Rules of Court, rule 8.316(a).)

---

[3]     We granted the Department's request to take judicial notice of the juvenile court's August 4, 2014 minute order.  (Evid. Code, § 452, subd. (c).)

**DISCUSSION**

1.      *The Juvenile Court Was Not Authorized to Continue Jurisdiction for the Sole Purpose of Ensuring Mother Received Regular Visitation*

After a juvenile court determines a dependent child may safely remain in the custody of a parent, the court holds periodic review hearings pursuant to section 364 to "determine whether continued supervision is necessary." (§ 364, subd. (c).) The juvenile court is required to "terminate its jurisdiction unless [the Department] establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (§ 364, subd. (c).)

We review orders made pursuant to section 364 for substantial evidence supporting the juvenile court's decision. (*In re N. S.* (2002) 97 Cal.App.4th 167, 172.) "Evidence sufficient to support the court's finding must be reasonable in nature, credible, and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case." (*Ibid.*)

The juvenile court assumed jurisdiction over Nathaniel based on the physical abuse inflicted upon the child by mother and her male companion, Jose R. At the time of the January 23, 2014 review hearing, the undisputed evidence was that Nathaniel had been safely maintained in father's custody for more than a year, with no credible concern of risk to the child's health or welfare. The Department's reports during that period consistently stated that Nathaniel was healthy and continued to "thrive in the home of father." He was "doing well in school" and reported to be "very comfortable and happy" in father's home. Based on those observations, the Department recommended that the court terminate jurisdiction pursuant to section 364 at the initial six-month review hearing, and at each of the continued hearings, up until it received an anonymous report, three days before the pending hearing to terminate jurisdiction, that father used drugs.

The anonymous allegation against father, without evidence to substantiate it, is not sufficient to conclude conditions existed that would have justified the initial assumption of jurisdiction over Nathaniel. (See § 364, subd. (c).) "While substantial evidence may consist of inferences, such inferences must rest on the evidence; inferences that are the result of speculation or conjecture cannot support a finding." (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1259.) Though the Department changed its recommendation concerning jurisdiction after the referral, its stated reason was only to "investigate" the allegation—an implicit acknowledgement it had no evidence, despite supervising the case for over a year, to substantiate the charge. To be sure, apart from the changed recommendation, the Department gave little indication that it even suspected the report might be true. Tellingly, after speaking with father about the referral, the Department took no steps to detain Nathaniel and apparently saw no reason to even request a drug test from father. The juvenile court plainly regarded the referral with the same incredulity. Though it allowed mother's counsel wide latitude in questioning father about his alleged drug use and past aspirations for a career in rap music, the court ultimately found nothing to warrant an order requiring father to drug test, and denied mother's request for drug testing as such.

In any event, the juvenile court left no doubt that its decision to retain jurisdiction had nothing to do with alleged drug use, and everything to do with father preventing mother from having visits with Nathaniel. As the court stated, "the *only reason* I'm keeping this open is because he's not visiting with his mother on a regular basis, and when I'm satisfied that's going to happen, then we can consider terminating this case." (Italics added.) The court's concerns about visitation and concomitant invocation of family law principles were not a proper basis for retaining dependency jurisdiction over Nathaniel.

First, the court's authority to retain jurisdiction was constrained by the plain terms of the Welfare and Institutions Code. Section 364 unequivocally states that "[t]he court *shall* terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under *Section 300 . . . .*" (Italics added.) The lack of consistent visitation with a noncustodial parent is not a basis for assuming jurisdiction under section 300, and it was an inappropriate ground for the juvenile court to retain jurisdiction here.

Second, the juvenile court erred by invoking a family law presumption to support its rationale for retaining jurisdiction. As justification for its decision, the court observed, "in fact, . . . it is a family law position that the custodial parent is to facilitate visitations, as well, with a noncustodial parent, and I think that's not happening." Contrary to the court's premise, "the presumption of parental *fit*ness 'that underlies custody law in the family court just does not apply to dependency cases.' " (*In re John W.* (1996) 41 Cal.App.4th 961, 972 (*John W.*).) Here, mother admitted to physically abusing and allowing Jose to physically abuse her five-year-old son, Nathaniel. Though mother had made commendable progress in completing the reunification services ordered by the court, the family law presumption of her fitness and entitlement to custody should not have been invoked as a basis for keeping this dependency case open, even if there was evidence that father had not fully cooperated with mother's visitation.

Third, the juvenile court's concern that "this case would drag on and on" if the visitation dispute were sent to the family law court also was not a legitimate basis for retaining jurisdiction. As the court explained in *John W.*, in view of the juvenile dependency system's important charge and limited resources, judges must be vigilant in preventing the system from being used to subsidize private child custody disputes: "The juvenile courts must not become a battleground by which family law war is waged by other means. It is common knowledge that the resources of local government social service agencies are stretched thin; in the juvenile dependency context those resources are manifestly intended to be directed at neglected and genuinely abused children."

11

(*John W., supra,* 41 Cal.App.4th at p. 975.) While the court was rightly focused on promptly settling the visitation issue so Nathaniel would have "some closure," that aim would have been better served by terminating jurisdiction and entering an exit order regarding visitation that mother could enforce in the family court without straining the limited resources allocated to protecting children in immediate risk of harm.

At the conclusion of the section 364 hearing, the juvenile court found that "[c]ontinued custody of [Nathaniel] with father does not create a substantial risk of detriment to the safety, protection, physical or emotional well-being of the child." In view of that finding, and the undisputed evidence showing that father had safely maintained Nathaniel in his custody for more than a year after the child's detention, the court was required by section 364, subdivision (c) to terminate its jurisdiction. (See *In re N. S., supra,* 97 Cal.App.4th at pp. 172-173.)

2.     *Mother's Appeal Is Moot*

"An appellate court will not review questions which are moot and only of academic importance, nor will it determine abstract questions of law at the request of a party who shows no substantial rights can be affected by the decision either way. [Citation.] An appeal becomes moot when, through no fault of the respondent, the occurrence of an event renders it impossible for the appellate court to grant the appellant effective relief. [Citations.] On a case-by-case basis, the reviewing court decides whether subsequent events in a dependency case have rendered the appeal moot and whether its decision would affect the outcome of the case in a subsequent proceeding. [Citation.]" (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054-1055.)

Mother appeals from the juvenile court's refusal to grant her unmonitored visits with Nathaniel at the section 364 review hearing. As we have concluded the court should have terminated its jurisdiction over the case at that time, there is no effective relief that we could give mother, regardless of whether we were to determine her progress in complying with the court ordered services warranted unmonitored visitation. Our conclusion regarding jurisdiction makes mother's appeal moot, and we dismiss her appeal on that basis.

12

**DISPOSITION**

Mother's appeal from the court's January 23, 2014 order is dismissed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, Acting P. J.

We concur:

ALDRICH, J.

EGERTON, J.[*]

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.